**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

EARTHA MINCY,                                    )       CASE NO. 1:18CV01400
                                                 )
                  Plaintiff,                     )
                                                 )
           v.                                    )       MAGISTRATE JUDGE
                                                 )       JONATHAN D. GREENBERG
NANCY A. BERRYHILL,                              )
           Acting Commissioner                   )
           of Social Security,                   )       **MEMORANDUM OF OPINION**
                                                 )       **AND ORDER**
                  Defendant.                     )

           Plaintiff, Eartha Mincy ("Plaintiff" or "Mincy"), challenges the final decision of

Defendant, Nancy A. Berryhill,[1] Acting Commissioner of Social Security ("Commissioner"),

denying her applications for a Period of Disability ("POD") and Disability Insurance Benefits

("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 416(i), 423, and 1381 *et seq.*

("Act").  This Court has jurisdiction[2] pursuant to 42 U.S.C. § 405(g) and the consent of the

parties, pursuant to 28 U.S.C. § 636(c)(2).  For the reasons set forth below, the Commissioner's

final decision is AFFIRMED.

_____

[1] On January 23, 2017, Nancy A. Berryhill became the Acting Commissioner of Social
Security.

[2] On December 26, 2018, this matter was stayed due to the lapse of congressional
appropriations funding the federal government.  *See* General Order 2018-15.  The stay
was thereafter extended pursuant to General Order 2019-1.  As the government shutdown
has ended, the stay imposed by General Orders 2018-15 and 2019-1 is hereby lifted.

1

# I.  PROCEDURAL HISTORY

In May 2015, Mincy filed an application for POD and DIB alleging a disability onset date of March 28, 2015 and claiming she was disabled due to manic depressive disorder, anxiety attacks, knee problems, heart problems, strokes, and angina.  (Transcript ("Tr.") at 214, 258.)  The applications were denied initially and upon reconsideration, and Mincy requested a hearing before an administrative law judge ("ALJ").  (Tr. 150, 161, 168.)

On April 19, 2017, an ALJ held a hearing, during which Mincy, represented by counsel, and an impartial vocational expert ("VE") testified.  (Tr. 38.)  On November 17, 2017, the ALJ issued a written decision finding Mincy was not disabled from March 28, 2015 to April 1, 2017, but disabled from April 2, 2017 through the date of the decision.  (Tr. 12-29.)  The ALJ's decision became final on April 20, 2018, when the Appeals Council declined further review.  (Tr. 1.)

On June 20, 2018, Mincy filed her Complaint to challenge the Commissioner's final decision.  (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 12, 14, 15.)  Mincy asserts the following assignment of error:

> (1)  Whether the ALJ's rationale for discounting the weight assigned to the April 7, 2019 Functional Capacities Evaluation is supported by substantial evidence.

(Doc. No. 12.)

# II.  EVIDENCE

## A.  Personal and Vocational Evidence

Mincy was born in April 1962 and was 55 years-old at the time of her administrative hearing, making her a "person of advanced age"  under social security regulations.  (Tr.120.)

*See* 20 C.F.R. §§ 404.1563(e).  She has a limited education and is able to communicate in English.  (Tr. 27.)  She has past relevant work as a nurses' aide.  (*Id.*)

## B.      Relevant Medical Evidence[3]

Prior to her alleged onset date, Mincy had an episode of transient right-sided weakness in 2012 and a myocardial infarction in 2014.  (Tr. 594.)  In June 2014, bilateral knee x-rays confirmed moderate to severe degenerative arthritis in both of her knees.  (Tr. 361.)

On June 11, 2014, Mincy visited physicians' assistant Tanya Davis, PA-C, for bilateral knee pain evaluation.  (Tr. 365.)  Mincy reported her knees had been "bothering her for years" and her pain increased with "walking, standing, or rising from a seated position."  (*Id.*)  She described a buckling sensation and relayed she was no longer able to work due to knee pain.  (*Id.*)  On examination, Mincy ambulated with an antalgic gait and a limp.  (*Id.*)  It was difficult for her to get on the examination table.  (*Id.*)  Ms. Davis observed knee tenderness, a decreased range of motion, and mild patellar crepitation.  (*Id.*)  However, Mincy had a full, painless range of motion in her hips, with no tenderness.  (Tr. 366.)  Ms. Davis diagnosed bilateral knee osteoarthritis, prescribed Naproxen, and administered bilateral knee steroid injections.  (*Id.*)

Mincy followed up with orthopedist Joseph George, M.D., on July 24, 2014.  (*Id.*)  She reported her right knee was "good" since the injections, but her left knee pain had returned.  (*Id.*)  On examination, Mincy had pain to palpation in her right knee, but was able to extend the knee within five degrees of full extension.  (*Id.*)  She had no pain with range of motion in her right hip and her left knee examination was benign.  (*Id.*)  Dr. George recommended a Synvisc injection

---

[3] The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs.

for the left knee and referred Mincy to a nutritionist due to her elevated body mass index ("BMI"). (*Id*.) Dr. George noted he made this referral "preemptively in case [he] decided to do a knee replacement surgery in the future." (*Id*.)

On March 20, 2015, Mincy visited gastroenterologist Mousab Tabba, M.D., for constipation and GERD. (Tr. 593.) Mincy that while she took GERD medications, she continued to have "breakthrough symptoms several times a week." (*Id*.) Dr. Tabba ordered a colonoscopy, which Mincy never obtained. (*Id*.)

A September 9, 2015 thyroid ultrasound revealed multiple thyroid nodules. (Tr. 554.)

Mincy saw nurse practitioner Kimberly Follett Vranic, CNP, for her constipation and abdominal pain on February 2, 2016. (Tr. 593.) Mincy reported chronic abdominal pain over the past year and a 40 pound weight loss. (*Id*.) On examination, her abdomen was soft and nondistended, with mild diffuse tenderness and no palpable abdominal masses. (Tr. 596.) She ambulated with a normal gait. (*Id*.) Ms. Vranic ordered a colonoscopy and EGD. (Tr. 597.)

On March 17, 2016, Dr. George provided the following statement regarding Mincy:

Eartha L. Mincy was seen in my office today for an evaluation.

She is under my care for bilateral knee osteoarthritis. She will be given bilateral cortisone injections.

(Tr. 646.)

Mincy returned to physicians' assistant Tanya Davis, PA-C, on March 31, 2016. (Tr. 655.) She reported her recent left knee injection was helpful and her left knee was "feeling pretty good." (*Id*.) On examination, Mincy had right knee tenderness and patellar crepitation. (*Id*.) Ms. Davis injected Mincy's right knee, noting that due to Mincy's "BMI she is not a surgical candidate, so she gets by with intra articular injections every [four] months or so." (*Id*.)

Ms. Davis and Mincy discussed the possibility of visco supplementation injections and Mincy agreed to consider this treatment. (*Id.*)

On April 7, 2016, Mincy underwent a functional capacities evaluation ("FCE") with a physical therapist.[4] (Tr. 678-682.) During the FCE, Mincy relayed she was not currently experiencing any pain. (Tr. 678.) She reported knee problems, a stroke, hand and foot neuropathy, anxiety, and memory problems. (*Id.*) On examination, Mincy was able to sit for 30 minutes and stand for 10 minutes. (Tr. 679.) She could occasionally lift 25 pounds, frequently lift 12.5 pounds, and constantly lift 5 pounds. (*Id.*) The physical therapist observed slightly decreased strength in Mincy's upper extremities, but full strength in her lower extremities. (Tr. 680.)

Based upon this evaluation, the physical therapist categorized Mincy's physical demand classification as "light." (Tr. 682.) The therapist noted Mincy demonstrated (1) good grip and pinch strength; (2) good upper and lower extremity range of motion and flexibility; (3) good upper and lower extremity strength; (4) good lift and carry tolerance for light physical demand level; (5) good sit tolerance; (6) good coordination and dexterity; and (7) decreased standing tolerance. (*Id.*) The physical therapist concluded Mincy had the following limitations:

- She can occasionally sit, stand, bend, reach forward, reach overhead, climb stairs, squat, walk, use her legs repetitively, and use foot controls;
- She can never climb ladders or balance;
- She can rarely kneel;
- She can frequently use her arms repetitively and use hand controls;

---

[4] The signature of this physical therapist is not legible. (Tr. 681.)

- She can stand for 15 minutes at one time;

- She can stand for a total of two hours in an eight-hour workday;

- She can sit for 60 minutes at one time;

- She can sit for four hours total in an eight-hour workday;

- She can lift and carry 25 pounds occasionally;

- She can lift and carry 10 pounds frequently;

- She can occasionally stoop; and

- She can never balance.

(*Id.*)  The physical therapist listed Mincy's "ability to work" as "part-time: mostly sitting." (*Id.*)

On April 16, 2016, Mincy visited the emergency room with right ankle pain. (Tr. 660.) On examination, her right ankle was swollen, but her gait was normal. (Tr. 660, 661.) X-rays confirmed a lateral soft tissue injury with no fracture. (Tr. 669.)

Mincy visited nurse practitioner Kimberley Vales, CNP, on April 25, 2016, to review her FCE results. (Tr. 690.) Mincy reported knee pain and bilateral swelling in her legs. (*Id.*) Ms. Vales recommended compression stockings and that Mincy elevate her legs when sitting. (*Id.*) Mincy described her knee pain as occurring "intermittently" and "fluctuating." (*Id.*) On examination, Mincy had a limp, bilateral leg edema, and decreased pulses in her feet. (Tr. 690, 694.)

On May 23, 2016, Mincy underwent a right leg ultrasound, which revealed thrombosis with partial compression of the right popliteal vein. (Tr. 744.) She was thereafter admitted to the hospital for deep vein thrombosis of the right leg and treated with Coumadin, an anticoagulant medication. (Tr. 723-724.)

6

Mincy followed up with Ms. Vales on June 3, 2016, denying any pain or symptoms from her deep vein thrombosis. (Tr. 867.) Ms. Vales recommended Mincy continue her anti-coagulant medications and elevate her legs when sitting. (Tr. 866.) On examination, Mincy had bilateral leg edema. (Tr. 870.) Ms. Vales referred Mincy to a vascular surgeon and renewed her hypertension and diabetes medications. (Tr. 867, 866.)

On June 7, 2016, Mincy visited the emergency room for knee pain. (Tr. 848.)

Mincy returned to Ms. Davis on July 28, 2016, for a knee injection. (Tr. 774.) Ms. Davis noted Mincy's last round of injections was in March and Mincy was not "currently a surgical candidate." (*Id*.) Mincy relayed the knee injections were helpful for about 2-3 weeks, but since then, her knee pain was progressing. (*Id*.) On examination, Mincy had knee tenderness with patellar crepitation. (*Id*.) Ms. Davis administered a left knee intra-articular injection and discussed visco supplementation with Mincy. (*Id*.)

From October 14 through October 18, 2016, Mincy was hospitalized for a stroke, after initially presenting to the emergency room with confusion, aphasia, and sharp head pain. (Tr. 807.) A brain MRI confirmed findings suggestive of acute or subacute stroke. (Tr. 814.) Mincy admitted she had not taken her anticoagulant medication, Xarelto, for several days. (*Id*.)

On January 27, 2017, Mincy visited neurologist Roya Vakili, M.D., for a neurological evaluation. (Tr. 956.) She reported weekly headaches, which lasted hours at a time. (*Id*.) She also described poor sleep and short term memory issues. (Tr. 957.) On examination, Mincy had normal strength in her upper and lower extremities, normal sensation in her extremities, no ataxia, no tremor, and a normal gait. (Tr. 959, 960.) She was unable to shin and heel walk due to her knee problems and had difficulty with tandem walking as well. (Tr. 960.) Dr. Vakili

ordered an updated MRA of the head and neck and MRI of the brain. (Tr. 964.) The doctor also increased Mincy's gabapentin dosage, advised her to check her blood pressure daily, exercise 3-4 times a week, and take her Xarelto. (Tr. 965.)

On February 15, 2017, pain management specialist Girgis E. Girgis, D.O., administered a nerve block to Mincy's right knee. (Tr. 999.)

## C.     State Agency Reports

### 1.        Mental Impairments

On August 5, 2015, state agency physician Paul Tangeman, Ph.D., reviewed Mincy's medical records and completed a Psychiatric Review Technique ("PRT") and Mental Residual Functional Capacity ("RFC") Assessment. (Tr. 124-125, 128.) He concluded Mincy had (1) mild restrictions in activities of daily living; (2) moderate difficulties in maintaining social functioning; (3) moderate difficulties in maintaining concentration, persistence, and pace; and (4) no episodes of decompensation. (Tr. 125.) With regard to Mincy's mental functional limitations, Dr. Tangeman adopted the findings of a prior ALJ decision, dated March 27, 2015, which found the following:

> The ALJ determined that the [claimant] is limited to simple, routine-type work in a static work environment with no production quotas but she may perform goal-oriented work. Can interact up to [occasionally] with others including the general public, co-workers and supervisors on a superficial basis defined as speaking and signaling, accepting and carrying.

(Tr. 128.)

On October 29, 2015, state agency physician Tonnie Hoyle, Psy.D., reviewed Mincy's medical records and affirmed Dr. Tangeman's assessment. (Tr. 138, 142.)

### 2.        Physical Impairments

8

On August 5, 2015, state agency physician Teresita Cruz, M.D., reviewed Mincy's medical records and completed a Physical RFC assessment. (Tr. 126-128.) Dr. Cruz determined Mincy could occasionally lift and carry 20 pounds and frequently lift and carry 10 pounds; stand and/or walk for a total of about 6 hours in an 8-hour workday; and sit for about 6 hours in an 8-hour workday. (Tr. 126.) She further found Mincy could occasionally climb ramps and stairs, never climb ladders, ropes, or scaffolds, and occasionally balance, stoop, kneel, crouch, and crawl. (Tr. 127.) Dr. Cruz concluded Mincy must avoid all unprotected heights and operation of dangerous machinery. (Tr. 128.)

On October 27, 2017, state agency physician Timothy Budnik, D.O., reviewed Mincy's records and adopted the findings of Dr. Cruz. (Tr. 139-141.)

**D.    Hearing Testimony**

During the April 19, 2017 hearing, Mincy testified to the following:

- She went through the tenth grade in school. (Tr. 45.) She attempted to go back to school for her high school diploma but was not successful. (*Id*.) She obtained an STNA certificate and worked as a nurse's aide in various nursing homes. (Tr. 45-47.)

- She has been using a "rollator" walker for about two years. (Tr. 49.) She told her doctor she needed it for balance and her doctor prescribed it to her. (*Id.*) She used a cane prior to using the walker. (*Id.*)

- She is often dizzy and off balance. (Tr. 50.) She uses her walker both in and outside of the home. (*Id*.) Prior to using the walker, she had multiple falls. (Tr. 57.)

- She drives, but always has someone with her because she gets lightheaded. (Tr. 51.) She does not drive on the highway. (*Id.*)

- She can stand for about 15 minutes before she needs to sit on her walker. (Tr. 58.) Her knees hurt with extended standing and walking. (*Id*.) Her knees feel swollen and she loses her breath when she walks. (Tr. 59.)

- She cannot walk a block. (Tr. 59.) She can walk for 7-8 minutes with her rollator before needing to rest. (*Id.*) She cannot sit for longer than an hour because her hips will lock up. (Tr. 62.) She uses a shower chair. (Tr. 82.)

- She has received steroid injections in her knees, but did not find them helpful. (Tr. 63-64.) Her left knee is more painful than the right. (Tr. 65.) She needs a knee replacement operation, but must lose weight before she can undergo this procedure. (Tr. 67.)

- She can lift and carry about 20 pounds. (Tr. 68.) If she lifts her grandson while standing, her knees will buckle. (Tr. 69.)

- She had foot and toe neuropathy, but it resolved. (Tr. 71-72.) She wears orthotics, which she finds helpful. (Tr. 88.)

- She gets sharp pains in her chest and takes a nitroglycerine tablet about once a month. (Tr. 73.) She has a great deal of anxiety over her chest pain. (*Id.*) She does not like to be in her home alone. (Tr. 74.) She is anxious around other people. (Tr. 78.)

- She does not socialize very much and does not like to be around strangers. (Tr. 74.) She is depressed. (Tr. 75.) She is fearful of dying and is emotional. (Tr. 76-77.) She has frequent crying spells and her "feelings are hurt easily." (Tr. 77.)

The VE testified Mincy had past work as a state-trained nurses' aide ("STNA"). (Tr. 90-91.) The ALJ then posed the following hypothetical question:

> Then if you would consider a person the claimant's age, education, and past relevant work activity – I'm going to give you two hypotheticals. The first is an individual with the capacity for light work who could occasionally climb ramps and stairs, never climb ladders, ropes, or scaffolds, occasionally balance, stoop, kneel, crouch, crawl, who would have to avoid all exposure to hazards such as industrial machinery and unprotected heights, and who had the capacity for simple, routine work performed in a static work environment with no high production quotas. Although, the capacity to perform goal oriented work – with a capacity to interact occasionally with others, including the general public, coworkers and supervisors, but on a superficial basis.

(Tr. 91.)

The VE testified the hypothetical individual would not be able to perform Mincy's past work as a STNA. (*Id*.) The VE further explained the hypothetical individual would be able to perform other representative jobs in the economy, such as a wire worker (D.O.T. #728.684-022), an electronics worker (D.O.T. #726.687-010); and an assembly press operator (D.O.T. #690.685-014). (Tr. 91-92.)

## III.   STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315 and 404.1505(a).1

A claimant is entitled to a POD only if: (1) she had a disability; (2) she was insured when she became disabled; and (3) she filed while she was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process. 20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4). *See also Ealy v. Comm'r of Soc. Sec*., 594 F.3d 504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990). First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time of the disability application. 20 C.F.R. §§ 404.1520(b) *and* 416.920(b). Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. §§ 404.1520(c) *and* 416.920(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work

11

activities." *Abbot*, 905 F.2d at 923. Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. §§ 404.1520(d) *and* 416.920(d). Fourth, if the claimant's impairment or combination of impairments does not prevent her from doing her past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)-(f) *and* 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

Here, Mincy was insured on her alleged disability onset date, March 28, 2015, and remained insured through June 30, 2019, her date last insured ("DLI.") (Tr. 19.) Therefore, in order to be entitled to POD and DIB, Mincy must establish a continuous twelve month period of disability commencing between these dates. Any discontinuity in the twelve month period precludes an entitlement to benefits. *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

## IV. SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through June 30, 2019.

2. The claimant has not engaged in substantial gainful activity since the alleged onset date (20 CFR 404.1571 *et seq*.).

3.      Since the alleged onset date of disability, March 28, 2015, the claimant has had the following severe impairments: osteoarthritis, obesity, affective disorder, and anxiety disorder (20 CFR 404.1520(c)).

4.      Since the alleged onset date of disability, March 28, 2015, the claimant has not had an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.      After careful consideration of the entire record, the undersigned finds that since March 28, 2015, the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except the claimant can occasionally climb ramps or stairs, but never climb ladders, ropes, or scaffolds, and occasionally balance, stoop, kneel, crouch, and crawl. The claimant is limited to simple, routine-type work in a static work environment with no production quotas, but she may perform goal-oriented work. The claimant can interact up to occasionally with others including the general public, co-workers, and supervisors on a superficial basis defined as speaking and signaling, accepting and carrying.

6.      Since March 28, 2015, the claimant has been unable to perform any past relevant work (20 CFR 404.1565).

7.      Prior to the established disability onset date, the claimant was an indivdual closely approaching advanced age. On April 2, 2017, the claimant's age category changed to an individual of advanced age (20 CFR 404.1563).

8.      The claimant has a limited education and is able to communicate in English (20 CFR 404.1564).

9.      Prior to April 2, 2017, transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled" whether or not the claimant has transferable job skills. Beginning on April 2, 2017, the claimant has not been here to transfer job skills to other occupations (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.     Prior to April 2, 2017, the date the claimant's age category changed, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR 404.1569 and 404.1569a).

11.     Beginning on April 2, 2017, the date the claimant's age category changed, considering the claimant's age, education, work experience, and residual functional capacity, there are no jobs that exist in significant numbers in the national economy that the claimant could perform (20 CFR 404.1560(c) and 404.1566).

12.     The claimant was not disabled prior to April 2, 2017, but became disabled on that date and has continued to be disabled through the date of the decision. Her disability is expected to last twelve months past the onset date (20 CFR 404.1520(g)).

(Tr. 19-29.)

## V.  STANDARD OF REVIEW

"The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 2011 WL 1228165 at * 2 (6th Cir. April 1, 2011).  Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards.  *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009).  Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).  In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence.  *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  The findings of the Commissioner

are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion.  *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999)("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.")  This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference.  *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal.  *See, e.g.,White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result."  *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir.1996); accord *Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely

overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI.  ANALYSIS

In her sole assignment of error, Mincy argues the ALJ did not properly evaluate the opinion of the physical therapist who conducted her April 2016 functional capacities evaluation ("FCE").  (Doc. No. 12 at 9.)  She insists the "reasons offered by the ALJ for discounting the FCE [are] not supported by substantial evidence."  (*Id.* at 11.)  Mincy asserts the medical records the ALJ cited to in discounting the physical therapist's opinion were not "relevant because they would not have involving testing [her] standing tolerance."  (*Id.*)  Mincy also maintains[5] the ALJ's conclusion the physical therapist provided an opinion on "an issue that is reserved for the Commissioner" is "legally incorrect" because the "abilities outlined in the FCE fit very comfortably within the regulations' definition of a medical opinion."  (*Id*. at 12.)

The Commissioner maintains the ALJ properly discounted the physical therapist's opinion.  (Doc. No. 14 at 3.)  The Commissioner asserts the ALJ correctly "recognized that the physical therapist was not a treating source, but rather was a one-time examining 'other source' who was a physical therapist, not a physician specialist."  (*Id*. at 4.)  The Commissioner notes the "ALJ's analysis was more than sufficient" and the "treatment records cited by the ALJ

---

[5]     In her Reply Brief, Mincy concedes the Commissioner "is likely correct when she characterizes the statement limiting her to part-time sedentary work is an issue reserved for the Commissioner."  (Doc. No. 15 at 1.)  Therefore, the undersigned will not address this aspect of Mincy's argument any further.

adequately demonstrate objective assessments of Plaintiff's ability to stand and walk over the course of the relevant time period that support the ALJ's decision." (*Id*. at 4, 5.)

Under Social Security Regulations, a physical therapist is not an "acceptable medical source" entitled to the type of "controlling weight" an "acceptable medical source" enjoys. *See* 20 C.F.R §§ 416.902(a)(1) - (8), 416.927(a)(1), 416.927(f).[6] However, the regulations also provide these opinions still must be considered, using the same factors listed in 20 C.F.R. §416.927(c). The regulations further provide "not every factor for weighing opinion evidence will apply in every case" and the "adjudicator generally should explain the weight given to opinions from these source or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicators's reasoning." 20 C.F.R. §416.927(f)(1)-(2).

Social Security Ruling 06-03[7] further explains how opinion evidence from "other sources" should be treated. SSR 06-03p provides information from "other sources" (such as a chiropractor) is "important" and "may provide insight into the severity of the impairment(s) and how it affects the individual's ability to function." SSR 06-03p, 2006 WL 2329939 at *2-3 (August 10, 2006). Interpreting this SSR, the Sixth Circuit has found opinions from "other sources" who have seen the claimant in their professional capacity "should be evaluated using the applicable factors, including how long the source has known the individual, how consistent the opinion is with other evidence, and how well the source explains the opinion." *Cruse v.*

---

[6]     For claims filed prior to March 27, 2017. *See* 20 C.F.R. §§ 416.902(a)(7).

[7]     The Court notes SSR 06-03p was rescinded on March 27, 2017. This rescission is effective for claims filed on or after March 27, 2017. SSR 96-2p, 2017 WL 3928298 at *1.

*Comm'r of Soc. Sec.*, 502 F.3d 532, 541 (6th Cir. 2007) ("Following SSR 06-03p, the ALJ should have discussed the factors relating to his treatment of Hasselle's assessment, so as to have provided some basis for why he was rejecting the opinion"). *See also Williams v. Colvin*, 2017 WL 1074389 at *3 (N.D. Ohio March 22, 2017).

As discussed *supra*, Mincy underwent a FCE with a physical therapist[8] on April 7, 2016. (Tr. 678-682.) Based upon this evaluation, the physical therapist listed Mincy's "physical demand classification" as "light." (Tr. 682.) The therapist noted Mincy demonstrated (1) good grip and pinch strength; (2) good upper and lower extremity range of motion and flexibility; (3) good upper and lower extremity strength; (4) good lift and carry tolerance for light physical demand level; (5) good siting tolerance; (6) good coordination and dexterity; and (7) decreased standing tolerance. (*Id*.) The therapist found Mincy had the following specific limitations:

- She can occasionally sit, stand, bend, reach forward, reach overhead, climb stairs, squat, walk, use her legs repetitively, and use foot controls;
- She can never climb ladders or balance, and rarely kneel;
- She can frequently use her arms repetitively and use hand controls;
- She can stand for 15 minutes at one time;
- She can stand for a total of two hours in an eight-hour workday;
- She can sit for 60 minutes at one time and for four hours total in an eight-hour workday;
- She can lift and carry 25 pounds occasionally and 10 pounds frequently;
- She can occasionally stoop; and

8 The signature of this physical therapist is not legible. (Tr. 681.)

• She can never balance.

(*Id*.)  The therapist also listed Mincy's "ability to work" as "part-time: mostly sitting."  (*Id*.)

In the decision, the ALJ discussed this opinion as follows:

On April 7, 2016, the claimant presented for a functional capacities evaluation with a physical therapist at the Mercy Regional Medical Center.  On that date, the claimant reported that she was not having any pain, and was able to sit for 30 minutes and stand for 10 minutes.  The claimant demonstrated normal range of motion in the bilateral upper extremities, 4/5 strength in the shoulders, and full strength, but decreased range of motion in the bilateral lower extremities.  Based on the claimant's performance, the physical therapist opined that the claimant could stand for a total of two hours in an eight-hour workday, sit for four hours in an eight-hour workday, and lift 25 pounds occasionally and ten pounds frequently.  They further indicated that the claimant could never climb ladders or balance, rarely kneel, frequently sit and use the upper extremities, and occasionally stand, bend, reach, climb stairs, squat, walk, and use the lower extremities.  Lastly, the physical therapist indicated that the claimant would be able to perform mostly seated part-time work (Exhibit B16F/2-6).  Although the physical therapist is not an acceptable medical source, the undersigned has considered their opinion with respect to their knowledge of the claimant's ability to function.  The undersigned notes that their assessment findings are partially consistent with the objective evidence of record.  Examination findings reflect that the claimant has limitations in standing and walking but generally retains good strength and range of motion of her upper and lower extremities as well as the general ability to ambulate (see, for example, Exhibit 9F/46, B14F/6, B22F/10, and B33F/13-15).  However, their conclusions that the claimant could perform primarily seated work on a part-time basis touches upon an issue that is reserved for the Commissioner, and as discussed previously, is one that is not entirely consistent with the objective evidence of record.  Therefore, the undersigned gives moderate weight to the physical therapist's opinion.

(Tr. 25-26.)

The Court finds the ALJ properly considered the opinion of the physical therapist who conducted the April 2016 FCE.  The ALJ expressly acknowledged the opinion of the physical therapist and provided several reasons for giving "moderate weight" to their conclusions.  (Tr.

19

25-26.) Specifically, the ALJ explained the physical therapist was not an "acceptable medical source" under the regulations, the findings were only "partially consistent with the objective evidence of record," and the therapist's conclusion Mincy was limited to part time seated work was "an issue that is reserved for the Commissioner." (Tr. 26.)

Moreover, prior to discussing this opinion, the ALJ discussed, in detail, the x-ray findings, the objective findings upon examination, as well as Mincy's selected course of treatment. (Tr. 23-25.) In particular, the ALJ acknowledged Mincy's x-rays established moderate to severe degenerative arthritis in both knees. (Tr. 23.) The ALJ also noted Mincy ambulated normally and without any ambulation aids at various times during the relevant period. (*Id*.) She considered the objective findings in the record, including intact strength, sensation, and a full range of motion. (*Id*.) The ALJ reviewed Mincy's treatment course, including corticosteriod injections, a nerve block, medications, and radiofrequency ablation. (*Id*.) The ALJ also discussed the objective findings made by the physical therapist during the FCE, including a normal range of motion in Mincy's upper extremities, a decreased range of motion in her lower extremities, decreased strength in her shoulders, and full strength in her legs. (Tr. 25.) After this careful review, the ALJ provided several reasons for why she was affording the physical therapist's opinion "moderate weight." (Tr. 26.) Thus, the ALJ properly considered the physical therapist's opinion as an "other source" and complied with the relevant regulation that she generally explain her reasons for giving it moderate weight. *See* 20 C.F.R. §416.927(f)(2). Procedurally, the regulations require no more.

Further, the ALJ's evaluation of the physical therapist's opinion is supported by substantial evidence. The record reflects Mincy has moderate to severe degenerative arthritis in

20

both of her knees.  (Tr. 361.)  She has displayed tenderness, a decreased range of motion, and crepitus in her knees.  (Tr. 365, 366, 655, 774.)  She has undergone multiple rounds of injections, which only provide temporary relief.  (Tr. 366, 655, 774.)  However, Mincy also has a full, painless range of motion in hips.  (Tr. 366.)  She has described her knee pain as occurring "intermittently" and during her FCE, she denied having any pain at all.  (Tr. 690, 678.)  Moreover, during the FCE, Mincy had full strength in her lower extremities.  (Tr. 680.)  During a neurological evaluation, she had a normal gait, normal sensation, and full strength in her upper and lower extremities.  (Tr. 959, 960.)

Mincy asserts the ALJ's reasons for discounting the physical therapist's standing limitations are "factually incorrect."  (Doc. No. 12 at 11.)  Mincy argues the "reason for standing limitations was due to diminished *standing* tolerance," noting the "FCE explicitly states that [she] was limited to standing 15 minutes at one time and two hours total in an 8-hour workday." (*Id*.)(emphasis in original)  Mincy contends the ALJ's citation to office visits which establish "good strength and range of motion of her upper and lower extremities as well as the general ability to ambulate" are irrelevant "because they would have not involved testing [her] standing tolerance."  (*Id*.)

The Court does not find this argument persuasive.  As an initial matter, the physical therapist found both standing and walking limitations, which the ALJ acknowledged.  (Tr. 682, 26.)  The ALJ then noted despite these limitations, the medical evidence confirmed a good range of motion and strength in Mincy's lower extremities.  (Tr. 26.)  Having good strength in the lower extremities would be directly related to Mincy's ability to stand.  Mincy appears to focus her argument on the four office visits the ALJ cited to when discussing the FCE, asserting they

did not involve "testing [her] standing tolerance." (*See* Tr. 26, Doc. No. 12 at 11-12.)  However, as discussed *supra*, even prior to considering the FCE, the ALJ reviewed additional medical evidence which confirmed intact leg strength.  (Tr. 23.)  In addition, Mincy does not direct this Court's attention to any medical evidence which would have "involved testing [her] standing tolerance," beyond this one-time examination conducted by an unnamed physical therapist.  (*See* Doc. No. 12 at 11.)  Indeed, the ALJ was free to discount the physical therapist's conclusions because a physical therapist is not an "acceptable medical source."  *See Bruce v. Comm'r of Soc. Sec.*, 2009 WL 239023, *10 (S.D. Ohio Jan. 29, 2009)("Moreover, the ALJ was not required to give any special deference to the therapist's functional capacity evaluation because therapists are not considered acceptable medical sources under the Social Security regulations."); *Fithen v. Comm'r of Soc. Sec.*, 2016 WL 1381822, *10 (S.D. Ohio Apr. 6, 2016)("Thus, the ALJ was not required to give any special deference or weight to Ms. Dorma's FCE.")*, report and recommendation adopted*, 2016 WL 2731683; *Olive v. Comm'r of Soc. Sec.*, 2007 WL 5403416, *11 (N.D. Ohio Sept. 19, 2007).

Mincy argues "pointing to evidence of her ability to *walk* should not, by itself, constitute substantial evidence sufficient to discount an opinion that speaks to her ability to *stand*." (Doc. No. 15 at 2.)(emphasis in original)  However, the ALJ noted Mincy had good strength in her lower extremities, which relates to her standing capabilities.  (Tr. 26.)  More importantly, because the FCE was not conducted by an acceptable medical source and therefore is not considered a medical source opinion, the ALJ was not required to explain each deviation between the FCE and the RFC.  *See McGee v. Comm'r of Soc. Sec.*, 2018 WL 6570681, *6 (N.D. Ohio Nov. 26, 2018), *report and recommendation adopted*, 2018 WL 6567775 (N.D. Ohio Dec.

13, 2018).  *See also Bruder v. Comm'r of Soc. Sec.*, 2018 WL 6386022, *6 (N.D. Ohio Dec. 6, 2018)("Bruder has not cited, nor is the court aware of, any legal authority requiring the ALJ to adopt, verbatim, an 'other source's' opinion.").

In sum, because the physical therapist is an "other source," the ALJ was not required to accord any particular weight to the opinion nor was she required to provide "good reasons" for rejecting portions of it.  Rather, the ALJ was required only to evaluate the opinion using the applicable factors set forth in the regulations.  *See Cruse*, 502 F.3d at 541.  The Court finds the ALJ properly evaluated the physical therapist's opinion for the reasons set forth above.

Accordingly, the Court finds substantial evidence supports the ALJ's evaluation of the physical therapist's opinion.  Thus, Mincy's assignment of error is without merit and does not provide a basis for remand.

## VII.    CONCLUSION

For the foregoing reasons, the Commissioner's final decision is AFFIRMED.

**IT IS SO ORDERED.**

_s/Jonathan D. Greenberg_
Jonathan D. Greenberg
United States Magistrate Judge

Date: April 16, 2019